## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| NERIUM BIOTECHNOLOGY, INC., and NERIUM SKINCARE, INC., | § § § | |
| Plaintiffs, | § § | |
| v. | § § | Civil Action No. 19-1753 |
| NEORA, LLC, | § § | |
| Defendant. | § § § | |

## PLAINTIFFS' COMPLAINT IN AID OF
## ARBITRATION AND APPLICATION FOR TEMPORARY
## RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Nerium Biotechnology, Inc. and Nerium Skincare, Inc. (together, "Biotech") submit this Complaint in Aid of Arbitration and Application for Temporary Restraining Order and Preliminary Injunction against, Neora LLC ("Neora"), and in support thereof state as follows:

## I.

## PRELIMINARY STATEMENT

"Real People, Real Results."  That is how Neora markets itself and promotes its new skin care products.  As recently touted by Jeff Olson ("Olson"), the owner and manager of Neora: "When we launched this company, we launched it around the word 'real.'  Real science and real results."  It turns out – unfortunately for Biotech, Neora's other competitors in the industry, and the consuming public – that nothing could be further from the truth.  To the contrary, Neora is using customer testimonials and "before and after" photographs of customers who used *Biotech's* Nerium brand products to falsely advertise its new products and stifle competition from Biotech and others.  Accordingly, by this action, Biotech seeks necessary injunctive relief.

1

## II.

## <u>INTRODUCTION</u>

Sometime after July 2018, Olson must have realized that he had a problem.  Nerium International, LLC ("International"), a company that he had co-founded in 2011 with Biotech, had entered into an agreement assigning to Biotech, among other things, all rights to sell the anti-aging skin care products made from the *Nerium oleander* plant and manufactured by Biotech ("NERIUM Products") – products which, according to International, had generated over $1 billion in sales. Further, the agreement required International to, *inter alia*:  (1) change its name to something not "confusingly similar" to Nerium; (2) stop using the word Nerium in commerce; (3) never refer to the new company as a "successor" to Nerium in commerce; (4) stop selling products manufactured using Biotech's patented NAE-8 *Nerium oleander* extraction process; (5) identify and release all of the trademarks and internet domain names used to sell those products; (6) turn over to Biotech electronic copies of all copyrighted and *copyrightable* materials related to NERIUM Products, including website content and marketing materials; and (7) instruct International's sales force of tens of thousands of "Brand Partners" of these restrictions and enforce their compliance therewith. After a short transition period, Olson would have to start over with a new name and new products, and Olson would have to disclose this to his sales force.

The problem was one of Olson's creation, as he had diverted tens of millions of dollars into his own pocket and was already in the process of improperly leveraging the NERIUM brand (which always belonged to Biotech) to peddle products that did not have the same active ingredient as the *Nerium oleander* products.  Caught red-handed, Olson agreed to pay Biotech $10 million and to give up International's name, history, star product, and the goodwill associated therewith.

Unfortunately, it now seems that Olson, true to form, could not keep his word and abide by the terms of the agreements he entered into.

Instead of a clean break from "Nerium," Olson "rebranded" International to a confusingly similar-sounding name, "Neora," hoping to forever intertwine the company with Biotech's highly successful NERIUM Products.  Instead of relying on real reviews of real Neora customers who actually used its new products, Neora put out false ads using recycled video footage of International's customers' reviews of NERIUM Products and passed them off as its own.  Instead of relying on "before and after" photographs of Neora customers using its new products, Neora simply reused old "before and after" photographs of International's customers who used NERIUM Products.  Instead of relying on its own results and being honest with the world about when its products came on the market, Neora put back-dated entries on its marketing blog and doctored old newspaper headlines to falsely make it appear as though it has been selling its new products years before the products were being sold.  Ironically, many of these false statements are found on Neora's website promoting its ad campaign, "Real People, Real Results."

Neora's actions are willful, intended to deceive the public, and causing significant confusion in the marketplace just as Biotech is set to reintroduce NERIUM brand products manufactured using its patented NAE-8 extraction process (*i.e.*, skin care products with the same main active ingredient, *Nerium oleander* extract, as the NERIUM Products) into the market.  Indeed, Neora's Brand Partners continue to conflate Neora's new products with Biotech's NERIUM Products.  That confusion is causing, and if left unrestrained will continue to cause, irreparable harm to Biotech.  Worse still, at the same time it is utilizing false advertising involving Biotech's NERIUM Products, Neora is refusing to deliver to Biotech electronic copies of all its copyrighted and copyrightable marketing materials, including website content used to market

NERIUM Products, as required by the parties' agreement.  Thus, Neora is deliberately violating the Lanham Act, 15 USC § 1125(a), as well its contractual obligations, to stifle competition from Biotech.

For these reasons, Biotech brings this action pursuant to the Lanham Act, 15 U.S.C. 1125(a), in aid of arbitration, seeking injunctive relief directing Neora to:  (1) remove its false and improper advertisements from the market; (2) issue corrective advertising to remedy the confusion its statements have caused; (3) refrain from making such statements in the future; (4) fully comply with its obligations to deliver to Biotech electronic copies of all copyrightable material that it is contractually obligated to provide; and (5) certify its compliance to the Court within thirty days.

**III.**

**<u>PARTIES</u>**

1.      Nerium Biotechnology, Inc. is a Canadian biotechnology research corporation with its principal place of business at 11467 Huebner Road, Suite 175, San Antonio, Texas 78230.  It may be contacted through its undersigned attorneys.

2.      Nerium Skincare, Inc. is a Texas corporation that develops, formulates, and manufactures natural skin care products with its principal place of business at 11467 Huebner Road, Suite 175, San Antonio, Texas 78230.  It may be contacted through its undersigned attorneys.

3.      Neora is a Texas limited liability company located at 4201 Spring Valley Road, Suite 900, Dallas, Texas 75244.  It may be served with process via its registered agent for service of process, Gail A. Lane at 4201 Spring Valley Road, Suite 900 Farmers Branch, TX 75244.

## IV.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over Biotech's claims under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Neora because Neora is a resident of Texas and regularly transacts business in the District.

6.      Venue in this District is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendant is subject to personal jurisdiction in this District.

## V.

## FACTUAL BACKGROUND

**A.      Biotech Develops A Skin Care Line With Age-Defying Results.**

7.      Nerium Biotechnology, Inc. is a scientific research and development company focused on the unique anti-cancer, anti-viral, immune-stimulating, and dermal health benefits of the *Nerium oleander* plant.  While studying the plant's ability to combat skin cancer, Nerium Biotechnology, Inc. discovered that *Nerium oleander* extract also had remarkable age-defying effects when used topically and saw the potential for a unique consumer product that could fund its research.  It then created Nerium Skincare, Inc. to develop and manufacture these natural skin care products.

8.      Following years of study, hard work, and millions of dollars in investment, Biotech developed a breakthrough age-defying skin cream containing *Nerium oleander* extract.  In 2009, Biotech patented its NAE-8 extraction process for the key ingredient in its skin cream and subsequently registered a number of trademarks containing the name NERIUM.  Biotech's first

sales under the "Nerium" mark were made to consumers in 2010.

**B.    Biotech Partners With Olson To Form International To Sell Its NERIUM Products Through A Direct Sales Company.**

9.      Olson was introduced to Biotech in or around 2010.  Olson had a background in the multi-level marketing ("MLM")[1] industry and was enthusiastic about Biotech's *Nerium oleander* product and its huge potential in the marketplace.  Eager to profit off of Biotech's work, Olson convinced Biotech to partner with him and entrust him with "marketing" Biotech's revolutionary products.

10.     Biotech and Olson formed International, owned 30% by Biotech and 70% by Olson's wholly-owned entity, JO Products, to market and distribute Biotech's *Nerium oleander* products.   Under their arrangement, Biotech manufactured the *Nerium oleander* products, including those branded as NeriumAD®, NeriumAD® Age-Defying Night Treatment, NeriumAD® Age-Defying Day Cream, NeriumFirm® Firming Body Cream.  And International, which Olson managed, sold them through its independent distributors, called "Brand Partners," using an MLM business model.  Biotech retained ownership of all NERIUM trademarks, and only granted International a license to use them in connection with the marketing, distribution, and sale of the Biotech-produced skin care products.

**C.    NERIUM Products Reach $1 Billion In Sales Relying On "Before and After" Photos And Customer Testimonials.**

11.     By all accounts, Biotech's NERIUM Products were a remarkable success.  In fact, in year one, International reported total sales in excess of $100 million and by 2015, sales of approximately $516 million.  By March of 2017, International was touting over $1 billion in total

---

[1] MLM is a product sales structure designed to utilize a sales force of independent sales representatives to sell products directly to consumers.

sales.  Key to the marketing and sales of NERIUM Products were customer testimonials and "before and after" photographs sharing the remarkable results customers reported from using Biotech's *Nerium oleander* products.

12.      In furtherance of that marketing strategy, International used those materials to advertise NERIUM Products' "Real Results" and encouraged its Brand Partners to distribute and discuss photos depicting customers both before and after using NERIUM Products as part of their marketing strategy.  According to an article posted in 2017 on "Business for Home," an MLM industry website touting "Direct Selling Facts and Figures & MLM News," "[International's] record-breaking growth comes from the company's satisfied customers who share their 'Before' and 'After' photos and powerful testimonials online and with friends."[2]  In that same article, Amber Olson Rourke, Olson's daughter and then International's Chief Marketing Officer, explained the strategy:

> The Real Results photos are a powerful tool in our business.  It's easy to share the products because the pictures tell the story.  And, in this case, a picture is worth a thousand words.[3]

13.      In addition to the "before and after" photos, International also used customer testimonials to help sell the NERIUM Products.  To that end, International often distributed promotional videos depicting customers and Brand Partners extolling the virtues of NERIUM

---

[2]   https://www.businessforhome.org/2017/03/nerium-international-crossed-the-1-billion-threshold/.

[3] *Id.*  As Amber Olson Rourke told Forbes last year:  "So, going back to our core value of being real, we wanted to give people results they could see and feel.  We predominately use real results pictures from our customers to market our products, not perfect models in perfect scenarios."    https://www.forbes.com/sites/bridgetarsenault/2018/07/30/in-conversation-with-amber-rourke-from-one-of-americas-fastest-growing-beauty-brands/#54a98f214cd9

Products.  These promotional videos were widely distributed to International's 100,000 Brand Partners, who were encouraged to share them with potential customers.

**D.      Olson Diverts Profits From Biotech And Misuses The Nerium Brand, Leading Biotech To Commence Litigation To Protect Its Rights.**

14.      Unfortunately, despite this phenomenal success, as sales climbed and began triggering bonus payments, Biotech saw very little of International's profits as Olson was diverting profits to himself, his relatives, and his associates, *i.e.*, self-dealing at Biotech's expense.  Olson also began leveraging the NERIUM brand – which, because of Biotech's patented NAE-8 *Nerium oleander* extraction process, was synonymous with International's skin care products – to market a non-Biotech product called Optimera, which International sold under the NERIUM banner, despite the fact that it contained no *Nerium oleander* extract.

15.      Left with no other option, Biotech commenced litigation against International and Olson to protect its rights.[4]  Biotech claimed, among other things, that Olson was violating International's Company Agreement by failing to distribute profits to Biotech.  Biotech also alleged that International was violating Biotech's trademark and other intellectual property rights by selling its knock-off product, Nerium Optimera.

**E.      To Resolve Their Dispute, The Parties Formulated A Plan To Chart Separate Paths And, To That End, Executed The Settlement Agreement And The IP Agreement.**

16.      Years into the litigation, and shortly before a scheduled trial, the parties negotiated a resolution that was intended to finally resolve their dispute and achieve a clean break between Biotech, on the one hand, and International and Olson, on the other.  To effectuate that plan, the parties negotiated and executed, among other documents, a Confidential Settlement Agreement

---

[4] *See Nerium Skincare, Inc., et. al. v. Nerium International, LLC, et al.*, Cause No. 3:16-cv-01217-B, United States District Court, Northern District of Dallas.

and Mutual Release (the "Settlement Agreement") and an Omnibus Intellectual Property Assignment and License Agreement (the "IP Agreement").[5]

17.     Under the terms of the IP Agreement, International agreed to give up all rights to use the NERIUM name or to sell any products that used Biotech's technology, thereby enabling Biotech to market and sell its *Nerium oleander* products (including the NERIUM Products previously sold by International) under the NERIUM name.  Olson agreed to "rebrand" International to another name (which was prohibited from being deceptively or confusingly similar to the name Nerium), and the parties agreed to a "Transition Period" from July 2018 through May 2019, during which International could use the NERIUM name and distribute NERIUM Product, to a limited extent.  After the Transition Period, Biotech was free to begin exclusively marketing and distributing NERIUM Products.

18.     By virtue of the IP Agreement, Biotech secured the valuable intellectual property rights associated with the NERIUM brand and the *Nerium oleander* products that International had sold with tremendous success.  Those rights were paramount to Biotech's willingness to resolve the litigation.  Pursuant to the IP Agreement, International assigned to Biotech:  (1) trademark rights in at least a dozen registered marks, as well as all common law rights in any trademark containing the name Nerium, and all goodwill associated with the business of International symbolized by and associated with those trademarks; (2) rights in every domain name ever used to market, distribute, and sell any International skin care products; and (3) rights in all copyrighted and *copyrightable* material relating to Biotech's skin care products, including all of the website

---

[5] A true and correct copy of the IP Agreement is attached hereto as Exhibit 1.

content[6] and marketing materials[7] ever used by International in the marketing, distribution, and sale of the products.

19.     In order to protect the value of this substantial transfer of intellectual property, the IP Agreement contains a number of restrictions designed to ensure the integrity and goodwill associated with the NERIUM brand, the Biotech-manufactured skincare products, and any future products marketed under the NERIUM name.  Those protections include, among other restrictions: (1) a prohibition on Neora or its Brand Partners disparaging Biotech or its products, (2) a prohibition on Neora using the word Nerium in commerce or from referring to itself as a successor to International; and (3) a prohibition on Neora selling any products containing *Nerium oleander*.

**F.     Biotech Signs An Exclusive Distribution Agreement With Pure Gen Holdings, LLC To Reintroduce Its *Nerium Oleander* Products To The Market.**

20.     It was no secret that Biotech intended to sell its *Nerium oleander* products manufactured using its patented NAE-8 extraction process after the conclusion of the Transition Period outlined in the IP Agreement.  That was a significant reason Biotech sought to preserve the valuable name recognition and goodwill of the NERIUM brand and hoped to capitalize the results that NERIUM Products' customers had achieved using them.

21.     On May 3, 2019, Biotech announced that it had entered into an exclusive relationship with PURE (People United Reaching Everyone) ("PURE"), an MLM Company, to

---

[6] The IP Agreement defines "Website content" as "any and all of the textual, visual, or aural content that is encountered as part of a user's experience on websites and may include, among other things, text, images, sounds, videos, and animations used by [International] in the marketing, distribution and sale of the Product Line."

[7] The IP Agreement defines "Marketing Materials" as "the hard goods including, but not limited to, compact discs, videos, manuals, brochures, sale literature used by [International] in the marketing, distribution and sale of the Product Line."

sell eight of its skin care products, which would be available to the public in the summer of 2019 (after the Transition Period ended). Under its agreement with PURE, Biotech has agreed to supply, among other products, PURE Nerium Night Cream, PURE Nerium Day Cream, and PURE Nerium Firm – Firming Body Cream. Each of these products are made using Biotech's patented NAE-8 extraction process and are substantially the same formulation as the *Nerium oleander*-containing products which were previously sold by International. PURE is the exclusive distributor of these products in the MLM space in the United States and numerous international markets.

22.     PURE will begin marketing and selling Biotech's products on August 1, 2019. Biotech has authorized PURE to use a number of its intellectual property rights in NERIUM Products. A key feature of Biotech and PURE's marketing plan for reintroduction of Biotech's *Nerium oleander* products into the market is to use client testimonials and "before and after" photographs of customers who have used Biotech's NERIUM brand products in the past. To date, however, Neora has refused to provide electronic copies of those materials for Biotech to use or provide to PURE to use.

**G.     Before The Ink Dries On The IP Agreement, Neora Begins Hindering Biotech's Ability To Sell Its Products.**

23.     It is now evident that Neora never intended to adhere to its obligations under the IP Agreement and compete fairly with Biotech. Neora and Olson apparently see Biotech's distribution of *Nerium oleander* skin care products as a direct threat to Neora's new line of non-*Nerium oleander* products. After all, having sold well over $1 billion in product under the NERIUM brand, Olson knows that the goodwill for products bearing the NERIUM name and made using Biotech's patented extraction process is substantial. That is why, in violation of Section 16 of the IP Agreement, Neora chose a name for itself that is confusingly similar to the name Nerium and gave its new products similar names to Nerium brand products (*i.e.*, Neora Firm – Body

11

Contour Cream, as opposed to NeriumFirm – Body Contouring Cream).

24.     Neora compounded that problem by refusing – and continuing to refuse – to release electronic copies of valuable, copyrightable material including marketing and website materials that it used to sell NERIUM Products, including all of its "before and after" photographs and client testimonials for NERIUM Products.  Finally, in an effort to further take advantage of the NERIUM legacy, Neora and Olson engaged in a concerted campaign to hinder Biotech's entry into the market with products bearing the NERIUM name by disparaging NERIUM Products and subordinating the NERIUM brand to the new Neora brand in the marketplace.

25.     Biotech has now become aware of the reason why Neora has refused to turn over valuable intellectual property to Biotech, including the valuable client testimonials and "before and after" photographs depicting customers who achieved favorable skin care results using NERIUM Products.  Not only does Neora hope to stifle competition from Biotech, but Neora is now using those materials, and other false advertisements, to deceive the public into thinking that customers of Biotech's NERIUM Products obtained their results using Neora's new products.

26.     Each of these violations (and others), along with the Lanham Act claims asserted herein, will be asserted in an arbitration between the Parties in Dallas County, Texas, which is being conducted by the American Arbitration Association ("AAA") and has been assigned Cause No. 01-19-0001-3026.  Pursuant to the parties' arbitration agreement, this action is being brought in aid of that arbitration seeking emergency injunctive relief.

## VI.

## THE NEED FOR INJUNCTIVE RELIEF

### A.     Neora Is Engaging In False Advertising.

27.     Not content to allow its new products to stand on their own, Neora has decided to

take years' worth of customer testimonials, "before and after" photographs, and blog posts related to Biotech's NERIUM Products and simply reuse them in new advertisements for Neora products. Neora's goal is simple:  convince the world that its new products are just a new version of, and as good as, the successful NERIUM Products it had been selling for years.  As Olson revealed in comments published on May 31, 2019:

> People are happy with an iPhone 7 until the iPhone 10 is released with upgrades and new technology, then everyone wants the new and improved version. The same is true for skincare technology, you must constantly be upgrading your science.
>
> Instead of taking the easy road and resting on their laurels, Neora strives to improve their products when science and nature offer an authentic opportunity to make them even more powerful and effective. Age IQ Night and Day Creams are the perfect example of seizing the opportunity to bring customers an even better product.

28.    The problem for Neora (and for the public) is that Neora's new products are <u>not</u> "new and improved version[s]" of the products that resulted in the "before and after" photographs and customer testimonials in its advertising.  Unlike the NERIUM Products, none of Neora's new products use NAE-8® (*Nerium* Aloe Extract) as their active ingredient.  Yet, Neora continues to use customer testimonials and "before and after" photographs of customers who used NERIUM Products to sell its new, non-NAE-8® products.  Neora's actions are false and deceptive.

**1.    <u>Neora deceptively uses customer testimonials.</u>**

29.    Onf February 1, 2019, Neora released a video on its YouTube channel entitled "Neora's Firm Body Contour Cream" (the "2019 Neora Firm Video"),[8] which Neora also posted on its Facebook page.  The 2019 Neora Firm Video begins with the narrator saying:

> The areas that tend to be the hardest to keep toned and tight are place

---

[8] Neora's video can be accessed at the following link: https://www.youtube.com/watch?v=keFBistl6EY&fbclid=IwAR116UD7SMEaSKVEkYlbL4Ag BTi3jjcSV9zX_FQwIqaXKzwp_UXRDVBuNhQ

> like the stomach, thighs, upper arms, and even love handles. That's
> where Neora's clinically proven firm body contour cream comes in.

Immediately following the introduction, a picture of Neora's Firm Body Contour Cream product is displayed:



30.    Based on the narrator's statements, the video's title, and the prominent display of the product packaging, there is no doubt that the video is a promotion for Neora's Firm Body Contour Cream.   The 2019 Neora Firm Video then shows a series of customer testimonials discussing how much the customers allegedly love the body contour cream.  For example, at the 0:37 mark, a testimonial for the following customers appears:



According to the man in the 2019 Neora Firm Video, "her knees look about thirty years younger,"

clearly referring to his wife's knees after using Neora's Firm product.  Except he is <u>not</u> referring to Neora's Firm product, because that embedded video excerpt was recorded in *2015,* years before Neora began selling its Firm product.  Below is a screenshot from a YouTube video, entitled NERIUM PRODUCT – Sizzle -US, that Neora (then International) released to the public in 2015 (the "2015 Nerium Sizzle Video"):[9]



The 2015 Nerium Sizzle Video contains much of the <u>exact</u> <u>same</u> <u>footage</u> as the 2019 Neora Firm Video, including the same statement by the man about his wife's knees.  As the 2015 Nerium Sizzle Video makes clear, the customer testimonial at issue concerns a NERIUM Product – not Neora's new product, which was not even sold when the footage was recorded and released in 2015.

31.    Unfortunately, Neora's use of this testimonial regarding NERIUM Products in marketing its new products was not an isolated incident.  At the 2:02 mark in the 2019 Neora Firm Video, the following customer appears, proclaiming that "My skin just tightened up and it feels so much better. It gives me confidence and I feel great about myself because of that."

---

[9] https://www.youtube.com/watch?v=-PZh78bEc6c

15



But here is a screenshot of the same customer from the 2015 Nerium Sizzle Video:



As is obvious from the customer's clothing and location, Neora simply recycled footage from a 2015 video shoot of customer testimonials regarding NERIUM Products and used it in the 2019 Neora Firm Video.  Again, as Neora Firm was not being sold in 2015, this customer could not be discussing Neora's Firm product.  There are numerous other examples of this.

16

32.     Below is screenshot for a customer testimonial beginning near the 2:08 minute mark of the 2019 Neora Firm Video in which the customer states that:

> I just really started to notice that the tone and texture of my skin had dramatically improved and I had people telling me that the results were photoshopped because it was that much better, which is very exciting.



Here is a screenshot from the 2015 Nerium Sizzle Video of the same customer saying the same thing:



33.     The 2019 Neora Firm Video also has a testimonial from the following customer

depicted below that claims: "The body contouring cream has done more for me than working out, eating healthy, losing weight. And, there are days that I just rub my legs and I'm like, 'you're so smooth now.'"



Again, that footage is of the same customer from the same video shoot in the 2015 Nerium Sizzle Video:



34.    In addition to the client testimonials, the 2019 Neora Firm Video contains numerous identical depictions of customers as those featured in the 2015 Nerium Sizzle Video, including:



35.   The 2019 Neora Firm Video also shows a number of "before and after" photographs depicting customers who have purportedly achieved their results using Neora's Firm product.  For example, in the 2019 Neora Firm Video, the following "before and after" photographs are displayed as representations of results achieved by customers using Neora's product:



Each of those photos, however, was previously used in videos in 2015 and 2016 promoting

NERIUM Products:[10]



36.     In addition, the 2019 Neora Firm Video depicts a number of individuals rubbing skin products on their skin, obviously stating that those individuals were using Neora Firm and suggesting that they look the way that they do as a result:



---

[10] https://www.youtube.com/watch?v=Skjax8yMr38 (8:12 mark); https://www.youtube.com/watch?v=tH7rj7IRd5M (3:16 mark).

Yet, all of this video footage was shot in 2015 (again, before Neora Firm was even being sold) and

was used in a 2015 video promoting NERIUM Firming Body Contouring Cream:[11]





    37.    The 2019 Neora Firm Video also features Olson at the 1:26 mark, in which he

claims that:

> When we launched this company, we launched it around the word
> 'real.' Real science and real results. We're committed to going out
> and finding the best scientists, the best. Biotechnology research to
> give products to people that really work and now with millions of
> bottles shipped and hundreds of thousands of customers, it's been
> proven these products work, not only in the labs but in people's
> lives.

---

[11] https://www.youtube.com/watch?v=c2Zlwp4cPGk



38.   The same footage, however, originally appeared in the 2015 Nerium Sizzle Video:



39.   Finally, the 2019 Neora Firm Video shows what purport to be texts chosen from among the "tens of thousands" of customers who have used its products:



40.     Even these texts, however, were previously used at the 3:41 mark in a 2016 video entitled Nerium Firming Contour Cream (the "2016 Nerium Firming Video"), albeit with the name "Nerium" in the third text, rather than the name "Neora:"[12]



---

[12] https://www.youtube.com/watch?v=hjsrCodSwuc

41.     In sum, almost all of the footage in the 2019 Neora Firm Video is recycled footage used to sell and promote NERIUM Products in 2015 and 2016, before Neora ever sold its current products.

**2.      Neora's deceptive use of "before and after" photographs.**

42.     As discussed above, "before and after" photographs have contributed significantly to the success of the NERIUM brand.  International marketed NERIUM Products for years under its "Real Results" campaigns.  On its website, www.nerium.com, International posted a series of "before and after" photographs depicting customers who used NERIUM Products and claimed that these products caused improvements in the appearance of their skin.  International encouraged its Brand Partners to distribute these "before and after" photographs to the public and made the photographs available to its Brand Partners through their online account access to International's computer system.

43.     Neora's website similarly contains a "Real Results" screen with a link prominently on its main website page, www.neora.com.  Below is a screenshot of Neora's main page, with the corresponding link to its "Real Results" page, which is located at www.neora.com/us/en/products/real-results:



44.     When a customer clicks on the "Real Results" link, he or she is directed to a page

containing sixty-eight (68) "before and after" photos with the following caption:



45.     Neora's "before and after" photographs are positioned on the webpage alongside a filtering tool that allows a customer to filter the "before and after" photographs by product, skin problem area, or body type:



46.   All of the "filtered" pictures draw from the full list of photographs on the main page, *i.e.,* there are no pictures in the filtered results that are not shown on the "full" list of photographs.

47.   Neora's claim is clear:  the "before and after" pictures on its website are pictures of Neora's customers using Neora's products.  But that claim is demonstrably false.  For example, below is a clip of "before and after" photograph of a customer Neora claims to have used its new "Age IQ" Night Cream:



48.   Here is the same photograph obtained from the Wayback Machine, an internet archive tool, showing the March 12, 2018 version of the Nerium International website:[13]

---

[13] The Wayback Machine is a digital archive of the World Wide Web and other information on the Internet. It was launched in 2001 by the Internet Archive, a nonprofit organization based in San Francisco, California, United States.  The website address for the Wayback Machine is archive/org/web.  The website address showing search results for the website address which contained                    this                    photograph                    is https://web.archive.org/web/20180312182128/http://www.nerium.com/us/en/products/real-results.



Age-Defying Night Cream (NeriumAD® Formula)

49.     The two "before and after" photographs are exactly the same.  In other words, in 2018, Neora claimed that the customer had obtained the pictured results using the NeriumAD Formula; now it falsely claims that the customer's results are attributable to Neora's new Age IQ Night Cream.  It is clear that Neora simply reused the photograph featuring the NERIUM Product and substituted the product name, thereby falsely claiming and misleading customers into believing that the photographs reflect the use of Neora's new product.

50.     True to form, Neora did the same things with its Age IQ Day Cream.  Here is a "before and after" photograph on Neora's website today depicting a customer who purportedly used its Age IQ Day Cream:

27



51.    And here is the same photograph obtained from the Wayback Machine, showing the March 12, 2018 version of the Nerium International website:[14]



---

[14] Because the Wayback Machine's internet archive takes "snapshots" of websites as they exist at various times, it appears to not archive all photographs on the website.  In this particular instance, the Wayback Machine failed to capture the after photograph for this particular entry.  There is, however, a blank slot on the webpage where the after photograph would have been depicted.  In connection with this filing, Biotech is seeking expedited discovery to confirm that the March 12, 2018 version of the www.nerium.com website in fact contained the same "after" picture for this particular customer that appears on Neora's website today.

52.     If a customer filters the results on Neora's "Real Results" page by body type the deception becomes even more pronounced.   For example, when the results are filtered by "stomach" for body type, the customer sees this:



53.     Each of those photographs has been used in the past to promote NeriumAD, a Biotech product that Neora is no longer permitted to sell.  For example, the following photograph appeared on Neora's former website (www.nerium.com) at least as early as August 2017, with a heading claiming it is a NeriumAD result:[15]

---

[15] https://web.archive.org/web/20170817124836/www.nerium.com/us/en/products/real-results



Firming Body Contour Cream, NeriumAD® Formula

54.     The other photograph was used on Brand Partner social media to promote

NeriumAD, at least as early as June 26, 2017:[16]



55.     When the results on Neora's "Real Results" page are filtered by "neck" for body

type, the customer sees the following:

---

[16] https://www.youtube.com/watch?v=c2Zlwp4cPGk



56.     As with its "stomach" photographs, however, each of those photographs has been used before by International to promote NeriumAD, a Biotech product that Neora no longer sells. For example, the following photographs appeared online on International's website at least as early as August 2017 with claims that these results were achieved using NeriumAD® Night Cream:[17]



Age-Defying Night Cream, NeriumAD® Formula          Age-Defying Night Cream, NeriumAD® Formula

---

[17] https://web.archive.org/web/20170817124836/www.nerium.com/us/en/products/real-results.  Again, because these photographs are from an archived version of the www.nerium.com website, not all .jpeg or other types of photo files are available.



Age-Defying Night Cream, NeriumAD® Formula                  Age-Defying Night Cream, NeriumAD® Formula

57.     Thus, <u>all</u> of the photographs shown under Neora's "neck" category for "before and after" photos depict customers who used NeriumAD.

58.     Neora's "arm" category fares no better.  Below is what customers see when they filter Neora's "Real Results" by the category "arm":



59.     Again, all of these "before and after" photographs depict customers who used NERIUM Products – not Neora's current products.  Below are social medias posts from Brand Partners from March and April 2017, using the same photographs to promote NeriumAD products:[18]

_____

[18] https://www.instagram.com/p/BR1OrF2Dc6T/;
https://www.instagram.com/p/BR531dcjABr/;





60.    Therefore, just as with "stomach" and "neck" problems areas, all of the "before and after" photographs on the Neora "Real Results" page, filtered for "arm," are actually depictions of customers using a NERIUM Product.

61.    All told, Neora's "Real Results" website page contains at least twenty-three (23) "before and after" photographs – more than one-third of the photographs touted by Neora on its "Real Results" page – depicting customers who actually used a NERIUM Product, as opposed to

Neora products.[19]  Below is a table showing each of the remaining known misleading "before and after" photographs featured on Neora's "Real Results" website page, with a corresponding prior image demonstrating that the photograph was previously used to promote NERIUM Products:



| Neora's Website Today: | Prior Use Of Photograph Promoting NERIUM: |
|---|---|
| | https://www.instagram.com/p/BSvgs1vA1eA/ April 11, 2017 |
| | www.nerium.com October 17, 2017 https://web.archive.org/web/201710170331 59/http://www.nerium.com:80/us/en/produc ts/real-results |

[19] Of course, until Biotech obtains discovery, it may not know how many additional false statements are on Neora's website pages.



https://www.instagram.com/p/BRym9rND44q/  March 18, 2017

https://www.instagram.com/p/BR_RiX5D_iU/  March 23, 2017

www.nerium.com  December 17, 2017

https://web.archive.org/web/20171217000055/www.nerium.com/us/en/products/real-results



https://www.facebook.com/mayra1987.nerium/photos/a.515903101910178/691369447696875

December 22, 2016

www.nerium.com October 17, 2017

https://web.archive.org/web/20171017033159/http://www.nerium.com:80/us/en/products/real-results



https://www.instagram.com/p/BRth76NARSz/

March 16, 2017

www.nerium.com   December 17, 2017

https://web.archive.org/web/201712170000 55/www.nerium.com/us/en/products/real-results

https://www.instagram.com/p/BSxqfqADBtQ/

April 12, 2017



https://www.instagram.com/p/BQ3ioBUDtgo/

February 23, 2018

www.nerium.com  December 17, 2017

https://web.archive.org/web/20171217000055/www.nerium.com/us/en/products/real-results

https://www.youtube.com/watch?v=UEGpfEfkv0g

Welcome To The Nerium Experience – 2016  (4:56 mark).

    3.      **Neora's deceptive entries on its blog.**

    62.    Before its name change, International maintained a marketing blog at the web address: neriumblog.net ("Neriumblog").  On its blog, International often advertised products such as NeriumAD® Day Cream, NeriumAD® Night Cream, and NeriumFirm – Contouring Body Cream.  For example, according to an internet archive from February 28, 2017, International posted the following blog entry about NeriumAD® Day and Night Creams on its Neriumblog:[20]



---

[20] https://web.archive.org/web/20170310180930/http://neriumblog.net/

63.     After the name change, Neora abandoned this blog and created a similar blog at the web address:   neorablog.com ("Neorablog").   When Neora created its new blog, it added an "Archives" section on its main page reflecting blog posts dating back to February 2017:



64.     The "Archives" blog posts, however, are recycled posts from the old Neriumblog – with references therein to NERIUM Products replaced with references to Neora's new products. The February 27, 2017 Neriumblog post shown above promoting NeriumAD® Day and Night Creams is but one example.   On Neorablog, the "archive" February 27, 2017 post looks like this:



Not only is the product changed in the picture from NeriumAD® Products to Neora Age IQ, but the link in the article to "Neora's Age Defying Night and Day Cream" takes customers to the website order page for Neora's new Age IQ products:



A potential customer reading this blog entry is likely to be deceived into believing that the original post was about Neora's Age IQ product, which is simply not true.  Further, this revisionist history falsely claims for Neora's products the same attributes previously claimed for NERIUM Products.

65.     The Neorablog "Archives" are replete with these types of deceptive "posts."  For its April 10, 2017 "Archive," Neora has a "post" that begins as follows:



This post is nearly identical the Neriumblog April 10, 2017 post:[21]

---

[21] https://web.archive.org/web/20170424055235/http://neriumblog.net/nerium-product/4-reasons-why-men-need-firming-body-contour-cream/



66.     As with the previously discussed post, Neora substituted a reference to its Firm product for the previous reference to a nearly identically-named NERIUM Product.  As a result, customers are misled into believing that this post is about Neora's Firm product when it is not.  By these deceptive blog posts, Neora creates the false impression that its new products have been on the market – and have seen tremendous success – for years.

**4.    Neora's doctored newspaper articles**

67.     Neora did not stop at doctored blog posts.  On its website, www.neora.com, Neora has a section near the bottom of the page entitled "In the News."  Below is a screenshot of the section:



68.    When a customer clicks on "SEE MORE," he or she is directed to the following URL:  https://www.neora.com/Home/about/in-the-news.  The following banner is at the top of the page:



69.    Prominently displayed at the top of this page is a "Forbes" headline entitled "Neora's hero product:  Age IQ Night/Day Cream – a one two punch age fighting punch."  The article is purportedly authored by Bridget Arsenault.  The Forbes headline, however, is fake. Below is a screenshot from www.Forbes.com for the article actually published in Forbes:[22]

---

[22] https://www.forbes.com/sites/bridgetarsenault/2018/07/30/in-conversation-with-amber-rourke-from-one-of-americas-fastest-growing-beauty-brands/#7e253c804cd9

9,954 views | Jul 30, 2018, 09:03pm

## In Conversation With Amber Rourke From One Of America's Fastest–Growing Beauty Brands



**Bridget Arsenault** Contributor
Travel



Amber Olson Rourke, the CMO of Nerium International.   COURTESY OF NERIUM INTERNATIONAL

The direct to consumer model shows no sign of slowing down, and one of the areas it's truly exploding in is in beauty and wellness. Based out of Texas, Nerium International is a hugely successful skincare company - with over two million customers around the world and record-breaking sales. They've designed a product line with both substance and style. We sat down with the booming brand's CMO Amber Olson Rourke to learn more.

70.     Neora's portrayal of the Forbes article is false because it changes the article's title and because it wrongfully attributes statements to Forbes itself.  Forbes never called Neora's Age IQ a "one-two age fighting punch."  Amber Olson said that in the interview.

71.     Neora also falsely claims on its website that other publications, including Glamour, Shape, Cosmopolitan, and Essence, have written about its current products.  Below are screenshots from Neora's "Neora Products In The Press" section of its website:[23]

---

[23] https://www.neora.com/us/en/about/in-the-news/product-press

47







72.     None of the depicted Neora products actually appear in the referenced publications.

**B.**     **Neora's Actions Are Creating Confusion In The Market.**

73.     As Neora must have intended, its Brand Partners are demonstrably confused about the association between Biotech's NERIUM Products and Neora's new products.  Given Neora's actions in using NERIUM Product customer testimonials and "before and after" photographs, it is

48

no surprise that Neora's tens of thousands of Brand Partners are following suit.  Below are just a

few of the numerous instances of Neora Brand Partners using "before and after" photographs of

NERIUM Product customers to promote Neora's new products:[24]



74.     There are numerous other instances of such actions by Neora's Brand Partners.

---

[24] https://www.instagram.com/p/Bvbg5tGg-vv/
https://www.instagram.com/p/BwRP8azHfLg/

75.     Neora's actions are creating confusion in the market as to Neora's new product's affiliation with NERIUM Products.  This is not surprising given Neora's confusingly similar name for its company, its confusingly similar name for its new "Firm" product, and its persistent use of customers testimonials and "before and after" photographs of customers who used NERIUM Products to promote its new products.

**C.      Neora's Actions Are Causing Irreparable Harm To Biotech.**

76.     As a direct competitor of Neora in the anti-aging skin care market, Biotech is harmed by Neora's false advertising.  Neora is attributing results and attributes to its products that they have not produced and do not have.  Worse still, it is using testimonials concerning and photographs of *Biotech's* products to do so.   Such misrepresentations give Neora an unfair advantage in the marketplace and are likely to result in increased sales for Neora at Biotech's expense.

77.     In addition, Neora's false use of NERIUM Product client testimonials and "before and after" photographs diminish the value of Biotech's intellectual property rights on those materials.  Biotech gave up considerable value in exchange for obtaining the rights to use copyrighted and copyrightable material previously used by International to promote and market NERIUM Products.  Biotech thus obtained the rights to use the very client testimonials and "before and after" photographs that Neora is now falsely portraying as pertaining to Neora's products. Until Neora's actions are stopped and its improper use of this intellectual property is removed from the marketplace, Biotech is effectively unable to use these materials.  The delay in Biotech's ability to use its own intellectual property just as it is set to reintroduce its *Nerium oleander* products into the market is difficult, if not impossible, to quantify.

78.     Biotech is also harmed in that it will unfairly have to compete in the marketplace against advertisements falsely depicting results from its own products as the results of a direct competitor.   By passing off NERIUM Products' client testimonials and "before and after" photographs as its own, Neora is placing Biotech at a distinct disadvantage in the marketplace. Biotech's products achieve unique anti-aging results.   Neora is claiming those results as its own. It is fair for Biotech to have to compete with actual Neora results.   It is not fair for Biotech to compete with its own results.   The disadvantage that Biotech will suffer as a result of Neora's actions is difficult, if not impossible, to quantify.

**D.      Biotech Seeks An Injunction In Aid of Arbitration.**

79.     Section 14 of the Settlement Agreement contains the following agreement to arbitrate, which encompasses this dispute:

> 14.     **Arbitration.** The parties agree that binding arbitration shall be the exclusive remedy for any and all disputes, claims or controversies, whether statutory, contractual or otherwise, between the parties hereto arising under or relating to this Agreement. The parties each waive the right to a jury trial and waive the right to adjudicate their disputes under this agreement outside the arbitration forum provided for in this agreement. In the event either party provides a notice of arbitration of any dispute to the other party, the parties agree to submit that dispute to a single arbitrator selected from a panel of arbitrators of AAA located in Dallas, Texas. The arbitration will be governed by the AAA Commercial Arbitration Rules and Procedures in effect at the time the arbitration is commenced. **Nothing in this section shall prevent any Party from applying to and obtaining from any court having jurisdiction a writ of attachment, a temporary injunction, preliminary injunction and/or other injunctive or emergency relief available to enforce to enforce [sic] this Agreement.** [emphasis added].

Although the IP Agreement does not contain an arbitration provision, it and the Settlement Agreement were meant to govern the parties' relationship and their marketing and advertisement of their respective products to the extent that those actions impact the other party.   As such, this

dispute is "related to" the Settlement Agreement.

## VII.

## CLAIMS FOR RELIEF

**A.      Count I:  Lanham Act 15 U.S.C. § 1125(a) (false advertising)**

80.      Biotech repeats each previous paragraph as if set forth fully herein.

81.      As set forth above, Neora has made false and misleading statements regarding its products.

82.      Neora's false and misleading statements have deceived or have the capacity to deceive a substantial segment of potential customers.

83.      Neora's false and misleading statements were material and likely to influence customers' purchasing decisions.

84.      Neora's false and misleading statements were made regarding products in interstate commerce.

85.      Biotech has been and is likely to continue to be irreparably injured as a result of Neora's false and misleading statements.

86.      Biotech therefore brings this claim pursuant to 15 U.S.C. § 1125(a).

87.      Neora's actions constitute willful violations of 15 U.S.C. § 1125(a).

88.      Biotech seeks injunctive relief from this Court directing Neora to remove all false and misleading statements regarding its products from commerce and a directive not to make such false and misleading statements in the future.

89.      Neora's actions constitute an exceptional case warranting the imposition of attorneys' fees.

B.   **Count II:  Breach Of Contract**

90.      Biotech repeats each previous paragraph as if set forth fully herein.

91.      The IP Agreement is a valid and enforceable contract.

92.      All conditions precedent to bringing this claim have been satisfied.

93.      Neora has violated Section 3 of the IP Agreement by failing to provide Biotech with "an electronic copy of each Copyright and Copyrighted works, including Marketing Materials and Website content."

94.      Biotech has suffered and will continue to suffer irreparable harm by being unable to use the valuable intellectual property for which it contracted.

95.      Biotech therefore seeks injunctive relief requiring Neora to immediately provide Biotech with "an electronic copy of each Copyright and Copyrighted works, including Marketing Materials and Website content."

## VIII.

## PRAYER FOR RELIEF

96.      WHEREFORE, Biotech prays, without waiving its right to arbitrate its underlying claims, that it be awarded a temporary restraining order and preliminary and permanent injunctive relief directing Neora to:  (1) remove any offending statements or misrepresentations from commerce; (2) refrain from engaging in similar advertisements in the future; (3) issue corrective advertising to alleviate customer confusion; (4) provide Biotech with "an electronic copy of each Copyright and Copyrighted works, including Marketing Materials and Website content;" and (5) certify its compliance to the Court within thirty (30) days.

97.      Biotech further prays that it be awarded its reasonable attorneys' fees incurred in pursuing this claim.

IX.

**APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

98.     This Application in supported by the Affidavit of Joseph B. Nester, ("Nester Affidavit") (attached hereto as Exhibit 1) and the Affidavit of Michael A. White, Jr. ("White Affidavit") (attached hereto as Exhibit 2.)

A.      **Facts Supporting Issuance Of Injunction**

67.     Plaintiff hereby incorporates sections V and VI of Plaintiff's Complaint with, as set forth above, as if set forth fully herein.

B.      **Applicable Legal Standards**

68.     Temporary restraining orders ("TROs") and preliminary injunctions are governed by Federal Rule of Civil Procedure 65.  Biotech respectfully requests that, pursuant to Rule 65, following notice to Neora, that the Court grant a TRO and, subsequently a preliminary injunction as outline herein.[25]

69.     To obtain a TRO or preliminary injunction, a movant must demonstrate four factors: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury in the absence of an injunction; (3) that the threatened injury outweighs any damage that the

---

[25] Although Rule 65 allows the Court to issue a TRO in certain circumstances without notice to Neora, Biotech is not seeking such relief by way of this application.  Rather, given that Neora has counsel in the Arbitration, Plaintiff asks the Court to allow it to notify Neora's counsel via hand-delivery and email of the pendency of this proceeding and the TRO request contained herein and allow Neora seven (7) days in which to submit a written response.  Following Neora's response and Biotech's reply, Biotech asks that the Court issue a TRO and set this matter for a hearing for consideration of Biotech's request for a preliminary injunction.

injunction might cause the defendants; and (4) that the public interest would not be disserved by the issuance of the preliminary injunction.[26]

70.     The Fifth Circuit applies a "sliding scale" to the four factors, "tak[ing] into account the intensity of each [factor] in a given calculus."[27]  If, for example, the movant's showing under factors 2 through 4 is strong enough, a preliminary injunction     n may issue even where the movant can only show "some likelihood of ultimate success."[28]  The Court has wide discretion in determining whether to grant a preliminary injunction.[29]

71.     As discussed in more detail below, each of these four factors favors issuance of a TRO and preliminary injunction requiring Neora to: (1) cease publishing the offending advertisements; (2) refrain from engaging in such advertising in the future; (3) issue corrective advertising to clear up confusion caused by its violations; (4) fully comply with its obligations under the IP Agreement to provide Biotech an electronic copy of its copyright materials (including website content); and (5) certify compliance to the Court within thirty (30) days.

   **1.     <u>Biotech is likely to prevail on the merits</u>.**

72.     To show a substantial likelihood of success, a movant must present a prima facie case, but need not prove that he is entitled to summary judgment.[30]   In evaluating likelihood of

---

[26] *Paulsson Geophysical Servs., Inc. v. Sigmar*, 529 F.3d 303, 309 (5th Cir. 2008).

[27] *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

[28] *Id.*

[29] *See Paulsson*, 529 F.3d at 309.

[30] *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

success on the merits, courts consider the standards provided by substantive law.[31]  Biotech asserts

a claim for violation of § 43(a) of the Lanham Act, 60 Stat. 441, codified at 15 U.S.C. § 1125(a).

Section 1125(a) provides:

> (1) Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or
> device, or any combination thereof, or any false designation of origin, false
> or misleading description of fact, or false or misleading representation of
> fact, which--
>
>> (A) is likely to cause confusion, or to cause mistake, or to deceive
>> as to the affiliation, connection, or association of such person with
>> another person, or as to the origin, sponsorship, or approval of his
>> or her goods, services, or commercial activities by another person,
>> or
>>
>> (B) in commercial advertising or promotion, misrepresents the
>> nature, characteristics, qualities, or geographic origin of his or her
>> or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is
> or is likely to be damaged by such act.[32]

73.    Court have recognized that Section 1125(a) "provides protection against a 'myriad

of deceptive commercial practices,' including false advertising or promotion."[33]  Section 43(a) of

the Lanham Act has been characterized as a remedial statute that should be broadly construed.[34]

a.  **Biotech is likely to prevail on its false advertising claim.**

---

[31] *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

[32] 15 U.S.C. § 1125(a).

[33] *Resource Developers v. Statue of Liberty-Ellis Island Found.,* 926 F.2d 134, 139 (2d Cir.1991).

[34] *Seven-Up Co. v. Coca-Cola Co*., 86 F.3d 1379, 1382-83 (5th Cir. 1996); *Gordon & Breach Science Publ's v. American Inst. of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y.1994) *aff'd.,*166 F.3d 438 (2d Cir. 1999).

74.     To prevail on a false-advertising claim under the Lanham Act, a plaintiff must satisfy the following elements: (1) a false or misleading statement of fact about a product; (2) such statement either deceived or had the capacity to deceive a substantial segment of potential consumers; (3) the deception was material, in that it is likely to influence the consumer's purchasing decision; (4) the product is in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the statement at issue.[35]

### i.     <u>Neora's advertisements are literally false.</u>

75.     The Fifth Circuit has recognized that in order to obtain "equitable relief in the form of an injunction, 'a plaintiff must demonstrate that the commercial advertisement or promotion is either literally false, or that [if the advertisement is not literally false,] it is likely to mislead and confuse consumers.'"[36]  The statements at issue must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact."[37]  Courts have specifically held that images may constitute literally false statements.[38]  Here, Neora's advertisements are literally false.

---

[35]  *Pizza Hut, Inc. v. Papa John's Int'l., Inc*., 227 F.3d 489 (5th Cir. 2000).

[36] *Pizza Hut, Inc. v. Papa John's Int'l., Inc*., 227 F.3d 489 (5th Cir. 2000).

[37] *Greater Hous. Transp. Co. v. Uber Techs., Inc.,* 155 F. Supp. 3d 670, 682 (S.D. Tex. 2015).

[38] *United Industries Corp. v. Clorox Co*., 140 F.3d 1175, 1180-81 (8th Cir. 1998) ("In some circumstances, even a visual image, or a visual image combined with an audio component, may be literally false.") (quoting *Coca-Cola Co. v. Tropicana Products, Inc.,* 690 F.2d 312, 318 (2d Cir. 1982) ("We find, therefore, that the squeezing-pouring sequence in the Jenner commercial is false on its face. The visual component of the ad makes an explicit representation that Premium Pack is produced by squeezing oranges and pouring the freshly-squeezed juice directly into the carton. This is not a true representation of how the product is prepared. Premium Pack juice is heated and sometimes frozen prior to packaging.").

76.     The 2019 Neora Firm Video is comprised almost entirely of false statements.  <u>First</u>, all of customer testimonials touting the virtues of Neora's new "Firm" cream are false as Neora did not even sell its new Neora Firm product in 2015 when the video testimonials were recorded. <u>Second</u>, Neora's use of customer testimonial "texts" are literally false as those same texts were used to promote NERIUM Products years earlier.  Incredibly, Neora edited the product name in one of the texts from "Nerium" to "Neora."  <u>Finally</u>, Neora's use of visual depictions of non-speaking persons who used skincare products are all false.  Each of those individuals appeared in videos in 2015 and 2016 promoting NERIUM Products.

77.     Neora also presents literally false "before and after" photographs in two different places.  <u>First</u>, Neora prominently placed "before and after" photographs of customers who used NERIUM Products in its 2019 Neora Firm Video.  <u>Second</u>, and even more egregious, Neora posted at least twenty-three (23) "before and after" photographs of customers who used NERIUM Products on its so-called "Real Results" website.  None of those twenty-three customers achieved their purported results from Neora's products.  Neora's use of the challenged "before and after" photographs constitutes literally false statements.

78.     Finally, Neora's back-dated marketing blog entries and newspaper article claims are also literally false.  <u>First</u>, the Neora Blog was not in existence in 2017.  Therefore, the posts from 2017 and early 2018 could not have been made on the dates that are attributed to them. <u>Second</u>, the blog posts have been edited, so that they do not appear as they were actually written on the date claimed and list a different product than the one described in the original post.  Neora did not sell its Firm or Age IQ products in 2017.  For it to claim otherwise by substituting its new product names into old blog posts makes those posts literally false.  <u>Third</u>, Neora's "Products In

The Press" page is likewise literally false.  Not only is the Forbes headline fabricated, but Neora's products do not appear in the other referenced publications.

> **ii.** **Neora's statements deceived or had the capacity to deceive a substantial segment of potential consumers.**

79.     Because Biotech has demonstrated that Neora's statements in its videos, on its website, and through its social media accounts are "literally false," Biotech "need not introduce evidence on the issue of the impact the statements had on consumers," as "the court will assume that the statements . . . misled consumers."[39]   Should the Court, however, conclude that the statements are "merely" misleading, because Biotech is only seeking injunctive relief in this action, it must only prove that the statements "have a tendency to deceive consumers," a standard that requires "less proof than actual deception."[40]

80.     Here, Biotech has proof that Neora's statements have a tendency to deceive – and have deceived – consumers.  Numerous Neora Brand Partners have followed Neora's lead and are using photographs of customers who used NERIUM Products to promote Neora's new products. This evidence conclusively demonstrates that Neora's statements "have a tendency to deceive customers."

> **iii.** **Neora's deception was material.**

81.     The Fifth Circuit has made clear that this element is only required if a statement is merely misleading, not if it is literally false.[41]  As with tendency to deceive, however, should the

---

[39] *Pizza Hut*, 227 F.3d at 497.

[40] *See id.* ("Plaintiffs seeking injunctive relief must prove that defendant's representations 'have a tendency to deceive consumers.'").

[41] *See Pizza Hut, Inc. v. Papa John's Int'l., Inc.,* 227 F.3d 489 (5th Cir. 2000) ("With respect to materiality, when the statements of fact at issue are shown to be literally false, the plaintiff need not introduce evidence on the issue of the impact the statements had on consumers."); *see also Logan v. Burgers Ozark Country Cured Hams, Inc.*, 263 F.3d 447, 462-63 (5th Cir. 2001)

Court conclude that Neora's statements are merely misleading, Biotech "must also introduce evidence of the statement's impact on consumers, referred to as materiality."[42]  One way of demonstrating materiality is to show that the representations regard an "inherent quality or characteristic" of the product.[43]

82.     Here, Neora's claims describe an "inherent quality or characteristic" of its anti-aging skin care products.  Neora is claiming that those products achieved results that they did not achieve.  Thus, Biotech has satisfied the materiality element.

### iv.     Neora's statements were made in interstate commerce.

83.     The Lanham Act requires that the allegedly false or misleading statements "enter into and/or have an effect on interstate commerce."[44]  "Transfer of products and advertisements through the internet is considered interstate commerce."[45]  Thus, all of Neora's challenged statements were made in interstate commerce.

### v.     Neora's actions have caused and are likely to cause Biotech competitive and commercial injuries.

---

("Because Logan established that HoneyBaked made literally false statements, HoneyBaked's argument that it did not mislead its customers and that advertisement did not affect the purchasing decision is inconsequential.").

[42] *Pizza Hut, Inc. v. Papa John's Int'l., Inc.,* 227 F.3d 489, 495 (5th Cir. 2000).

[43] *Cashmere & Camel Hair Mfct v. Saks 5th Ave*, 284 F.3d 302, 311-12 (1st. Cir. 2002) ("One method of establishing materiality involves showing that the false or misleading statement relates to an 'inherent quality or characteristic' of the product.").

[44] *Hunn v. Dan Wilson Homes, Inc.,* 789 F.3d 573, 588 (5th Cir. 2015); *Greater Hous. Transp. Co. v. Uber Techs., Inc.,* 155 F. Supp. 3d 670, 702 (S.D. Tex. 2015).

[45] *Finger Furniture Co. v. Mattress Firm, Inc.,* Civil Action No. H-05-0299, 2005 U.S. Dist. LEXIS 18648, at *14 (S.D. Tex. July 1, 2005) (citing *United States v. Runyan*, 290 F.3d 223, 238 (5th Cir. 2002)); *see also S & H Indus. v. Selander*, 932 F. Supp. 2d 754, 763 (N.D. Tex. 2013) ("Plaintiff presented evidence that Defendant disseminated the statement through its internet advertising, and therefore demonstrated that the statement entered interstate commerce.").

84.     Numerous courts have recognized that the harm element for an injunction under the Lanham Act is different than that required to recover monetary damages.[46]  As the Supreme Court has recognized, "[e]ven when a plaintiff cannot quantify its losses with sufficient certainty to recover damages, it may still be entitled to injunctive relief under § 1116(a)."[47]

85.     "The Lanham Act was enacted to protect persons engaged in such commerce against unfair competition."[48] As the Supreme Court recently recognized, "[c]ompetitors who manufacture or distribute products have detailed knowledge regarding how consumers rely upon certain sales and marketing strategies. Their awareness of unfair competition practices may be far more immediate and accurate than that of agency rule makers and regulators. Lanham Act suits draw upon this market expertise by empowering private parties to sue competitors to protect their interests on a case-by-case basis."[49]

86.     As a direct competitor of Neora in the anti-aging skin care market, Biotech is naturally harmed by Neora's false advertising.  Neora is attributing results and attributes to its products that they do not have.  Worse still, it is using testimonials and photographs concerning Biotech's own products to mislead the public.   Such misrepresentations give Neora an unfair advantage in the marketplace and are likely to result in increases sales for Neora at Biotech's expense.

---

[46] *See, e.g., Logan v. Burgers Ozark Country Cured Hams, Inc*., 263 F.3d 447, 462-63 (5th Cir. 2001) (noting the distinction between the proof necessary to establish recovery of monetary damages and that necessary to show sufficient harm to allow a litigant to seek an injunction).

[47] *Lexmark*, 134 S. Ct. at 1392.

[48] *Seven-Up Co. v. Coca-Cola Co*., 86 F.3d 1379, 1382-84 (5th Cir. 1996).

[49] *POM Wonderful LLC v. The Coca-Cola Co*., 537 U.S. 102, 115 (2014).

87.     In addition, Neora's false use of NERIUM Product client testimonials and "before and after" photographs diminishes the value of Biotech's intellectual property rights on those materials.  Biotech gave up valuable rights in exchange for obtaining the rights to use copyrighted and copyrightable material previously used by International to promote and market NERIUM Products.  Biotech thus obtained the rights to use the very client testimonials and "before and after" photographs that Neora is now falsely portraying as pertaining to Neora's products.  Until Neora's actions are prohibited and its use of this intellectual property is removed from the marketplace, Biotech is effectively unable to use these materials as evidence of the results achieved in the past by NERIUM Products with the same primary active ingredient (NAE-8) that is being used in current Biotech products.  The delay in Biotech's ability to use its own intellectual property just as it is set to reintroduce its *Nerium oleander* products into the market is difficult, if not impossible, to quantify.

88.     Biotech is also harmed in that it will unfairly have to compete in the marketplace against advertisements depicting results from its own products as the results of a direct competitor.  By passing off NERIUM Products' client testimonials and "before and after" photographs as its own, Neora is placing Biotech at a distinct disadvantage in the marketplace.  Biotech's products achieve unique anti-aging results.  Neora is passing those results off as its own.  It is fair for Biotech to have to compete with actual Neora results, not Biotech's own results.  The disadvantage that Biotech will suffer as a result of Neora's actions is difficult, if not impossible, to quantify.

### b.     <u>Biotech is likely to prevail on its breach of contract claim.</u>

89.     Under Texas law, the elements for a breach of contract claim are: (1) the existence of a valid contract; (2) the plaintiff performed or tendered performance as the contract required;

(3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach."[50]

90.     Here, Biotech has presented evidence of the existence of a valid contract for Neora to provide it with electronic copies of website and other materials used to market NERIUM Products.  Neora has breached that duty, and Biotech is being harmed by its inability to use those materials to market its products with PURE.  Every day that Biotech is deprived of the use of those materials is harmful to Biotech.  As the ongoing harm is difficult, if not impossible to quantify, Biotech has shown sufficient harm to warrant an injunction requiring Neora to deliver these materials.

## 2. Biotech faces a substantial threat of irreparable injury in the absence of an injunction.

91.     "[A]n injury is irreparable only if it cannot be undone through monetary remedies."[51]  In cases involving Lanham Act claims, courts within the Fifth Circuit "presume the existence of an irreparable injury if the plaintiff establishes a substantial likelihood of confusion" or a "tendency to deceive."[52]  Because Biotech has shown that the misrepresentations in Neora's

---

[50] *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

[51] *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472-73 (5th Cir. 1985); *see also ADT, LLC v. Capital Connect, Inc.*, 145 F. Supp. 3d 671, 697 (N.D. Tex. 2015) ("A party sufficiently proves that monetary damages are not adequate when it brings forward evidence, in the form of affidavits, declarations, or any other support, that shows imminent harm that is difficult to quantify.").

[52] *Sparrow Barns & Events, LLC v. Ruth Farm Inc.*, Civil Action No. 4:19-CV-00067, 2019 U.S. Dist. LEXIS 61515, at *22 (E.D. Tex. Apr. 10, 2019); *Healthpoint, Ltd. v. Stratus Pharm.*, 273 F. Supp. 2d 769, 813 (W.D. Tex. 2001) ("When injunctive relief is sought under the Lanham Act, the finding of a tendency to deceive satisfies the requisite showing of irreparable harm."); *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013) ("All that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed."); *Better Keiki, LLC v. MairicoDirect*, Civil Action No. 4:17-cv-00850, 2018 U.S. Dist. LEXIS 204167, at *16-17 (E.D. Tex. Oct. 23, 2018) ("Plaintiff has shown that these infringing acts show a likelihood of market confusion regarding their products

advertisements and promotions have, at a minimum, a tendency to deceive consumers, the Court may presume that Biotech will be irreparably harmed if the requested injunctive relief is not granted.

92.     Even in the absence of this presumption, however, Biotech would still be entitled to injunctive relief because it has made the requisite showing of irreparable injury.[53]  Courts emphasize that injury may be established by "drawing fair inferences from facts in the record."[54]  Indeed, "courts considering whether to grant injunctive relief must exercise their equitable

---

and therefore, an irreparable injury."); *OrthoAccel Techs., Inc. v. Propel Orthodontics, LLC*, No. 4:16-CV-350, 2016 U.S. Dist. LEXIS 148059, at *19-20 (E.D. Tex. Oct. 26, 2016) (applying irreparable injury presumption to case involving false advertising claim under Lanham Act, but also noting that, in any event, plaintiff's evidence supported claim that it was losing market share to defendant); *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, No. 4:14-0941, 2015 U.S. Dist. LEXIS 28867, at *52 (S.D. Tex. Mar. 10, 2015) (presuming irreparable injury in Lanham Act case "based on alleged comparative misrepresentations" in advertisements); s*ee also Myo, LLC v. Brull & York, LLC*, No. 1:18-CV-370-RP, 2019 U.S. Dist. LEXIS 3424, at *19-20 n.8 (W.D. Tex. Jan. 8, 2019) (noting that "likelihood of confusion in a trademark action is generally sufficient to establish risk of irreparable harm" but ultimately finding that plaintiff failed to establish likelihood of confusion and therefore failed to prove irreparable harm).

[53] Some courts have abandoned all uses of "presumptions" in evaluating injunctive relief following the Supreme Court's decision in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391, 126 S. Ct. 1837 (2006), wherein the Court rejected use of injunctive relief in patent cases because "whether to grant or deny injunctive relief . . . must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases."  In its first opportunity to extend *eBay* to Lanham Act cases, the Fifth Circuit did not decide the issue.  *See Paulsson Geophysical Servs. v. Sigmar*, 529 F.3d 303, 313 (5th Cir. 2008) ("We have no need to decide whether a court may presume irreparable injury upon finding a likelihood of confusion in a trademark case, a difficult question considering the Supreme Court's opinion in *eBay*.").  In *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 627 (5th Cir. 2013), the Fifth Circuit, after citing to the *eBay* decision, held that "[a]ll that must be proven to establish liability and the need for an injunction against infringement is the likelihood of confusion—injury is presumed."  This, combined with several district court opinions continuing to apply presumptions of injury in Lanham Act cases, lead one district court to conclude that "the presumption [of irreparable injury in Lanham Act cases] is somewhere between shaky and reaffirmed."  *T-Mobile US, Inc. v. Aio Wireless LLC*, 991 F. Supp. 2d 888, 928 (S.D. Tex. 2014).

[54] *ADT*, 145 F. Supp. 3d at 697.

discretion in a case-by-case, fact-specific manner," and "[a] critical aspect of fact-finding in [the context of a request for injunctive relief] is drawing reasonable inferences from facts in the record."[55]

93.     As discussed above, Biotech, as a direct competitor of Neora, has been harmed in multiple ways and is likely to continue to be harmed in the absence of an injunction.  The harm to Biotech is difficult if not impossible to quantify.  Biotech has provided sufficient proof irreparable harm to support issuance of an injunction in this case.

### 3.     Biotech's threatened injury outweighs any damage that the injunction might cause to Neora.

94.     Here, there is frankly little to balance.  Biotech has demonstrated that it is likely to suffer irreparable injury if Neora's actions are not enjoined.  Neora will incur no damages that equity should protect in having to stop disseminating false statements to the market and to issue corrective advertising to remedy the confusion that its false statements have caused.

### 4.     The public interest would not be disserved by the issuance of a preliminary injunction.

95.     "The public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks."[56]  Because Plaintiffs have shown a likelihood of success on the merits of their Lanham Act false advertising claim, it follows that the public's abiding interest in enforcing the law would be best served by the issuance of a preliminary injunction here.

---

[55] *Groupe SEB United States, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 205 (3d Cir. 2014).

[56] *Pet Silk, Inc. v. Jackson*, 481 F. Supp. 2d 824, 834 (S.D. Tex. 2007) (quoting Quantum Fitness, 83 F. Supp. 2d at 831).

## X.

## <u>REQUEST FOR EXPEDITED DISCOVERY</u>

Due to the irreparable harm established herein, and so as to properly prepare for any evidentiary hearing the Court may require regarding this matter, Biotech respectfully requests that the Court allow expedited discovery to be completed within fourteen (14) days' time so that Biotech's request for injunctive relief may be resolved expeditiously.   Specifically, Biotech requests permission to:  (1) propound one set of requests for production not to exceed fifteen (15) individual requests; (2) propound one set of interrogatories, not to exceed fifteen (15) total interrogatories; and (d) take three (3) depositions of Neora employees, including Olson and a corporate representative pursuant to FED. R. CIV. P. 30(b)(6).  Biotech requests that Neora be required to respond to Biotech's written discovery within five (5) business days of service and to produce requested witnesses for deposition within five (5) business days of notice.

## XI.

## <u>CONCLUSION</u>

For the foregoing reasons, Biotech respectfully request that it be granted injunctive relief as discussed herein, its reasonable attorneys' fees incurred in bringing this action, and such further relief to which it shows itself entitled in this action.


Respectfully submitted,

**GARDNER HAAS PLLC**


By: /s/ Jeremy R. Wilson
    Michael S. Gardner
    State Bar No. 24002122
    mg@gardnerhaas.com
    Jeremy Wilson
    State Bar No. 24037722

jw@gardnerhaas.com

2501 N. Harwood St., Suite 1250
Dallas, Texas 75201
Telephone: (214) 712-8280

**ATTORNEYS FOR PLAINTIFFS
NERIUM BIOTECHNOLOGY, INC. AND
NERIUM SKINCARE, INC.**